**SAMPSON CONSTRUCTION COM-
PANY, Inc., Appellant,**

v.

**FARMERS COOPERATIVE ELEVATOR
COMPANY, MARSHALL, OKLA-
HOMA, Appellee.**

**No. 8812.**

United States Court of Appeals
Tenth Circuit.

Aug. 8, 1967.

Donald R. Newkirk, Wichita, Kan. (Wayne Coulson, Paul R. Kitch and Dale M. Stucky, Wichita, Kan., on the brief), for appellant.

Alex Cheek, Oklahoma City, Okl., (Cheek, Cheek & Cheek, Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, LEWIS and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Farmers Cooperative Elevator Company,[1] an Oklahoma corporation, brought this action against the Sampson Construction Company,[2] a Kansas corporation, to recover damages for a breach of an implied prospective covenant in a contract for the construction by Sampson of a grain storage annex to a grain elevator owned by the Elevator Company.

On February 17, 1959, the Elevator Company entered into a contract with Sampson, by which Sampson agreed to furnish the design, plans and specifications for the construction of such grain storage annex, consisting of 13 storage tanks with a capacity of 288,000 bushels, and to provide the engineering, materials and labor for the construction of such grain storage annex and to construct it, in accordance with such plans and specifications, as a turn-key job.

The specifications furnished by Sampson provided that the steel reinforced concrete in the structure would be mixed in such a proportion that it would have a compression strength upon 28 days of curing of 3,000 pounds per square inch.

The annex was completed in June, 1959, although some repairs were made by Sampson in the period between June, 1959, and June 14, 1962.

On June 19, 1964, four of the 13 tanks that were filled with wheat to their capacity collapsed, spilling the wheat and broken pieces of concrete mixed together on the ground. The elevator was a federally licensed grain storage warehouse and a federal examiner ordered that the grain in the remaining nine tanks be removed and that they not be used for storage unless and until their use was approved by a qualified engineer. The nine tanks were found not suitable for further use for grain storage.

Samples were taken, consisting of representative pieces of concrete that came from different locations in the four tanks that had collapsed, and which provided a fair sampling of the concrete in such tanks. Six of them, picked at random, were selected for compression tests. One was not tested, because it had a hairline fracture in the core taken therefrom. The other samples showed a compression strength of 1,575, 2,290, 1,660, 2,710 and 1,880 pounds per square inch.

Pieces of the broken concrete were examined and disclosed the cement had pulled away from the rock aggregate in the concrete, instead of breaking such aggregate apart as it would have done, had the concrete had a compression strength per square inch of 3,000 pounds. The investigator found pieces of broken concrete, where the cement could be rubbed away from the aggregate with the fingers, showing that there were places where either the mixture was not strong enough to hold the aggregate in the cement, or the bond between batches of cement poured at different times was too weak to hold them together in the structure.

Steel hooks are used to anchor the steel reinforcing bars in the concrete. The hooks used in the concrete in the collapsed tanks were too short and too small in diameter to meet recognized standard requirements and to perform their intended function of preventing the reinforcing bars from slipping. When a reinforcing bar so slips, the result is increased pressure or thrust on the other bars in the concrete in the adjacent area.

The inadequate compression strength of the concrete, the areas in the structure where the cement was too weak, or where different batches were not properly bonded, and defective anchorage of

---

1. Hereinafter called the Elevator Company.

2. Hereinafter called Sampson.

the reinforcing bars resulted in a structural failure, which was the proximate cause of the collapse.

The Elevator Company could not have discovered the weaknesses in the concrete or the inadequacy of the hooks by the exercise of reasonable diligence, before the collapse of the tanks on June 19, 1964.

The trial court held that the warranty was prospective and instructed the jury that where a general contractor is engaged in the business of building grain storage facilities "and by contract undertakes to perform and furnish material, * * * requiring the exercise of care, skill and knowledge to perform such work and furnish such material, there is an implied warranty that the work and material furnished by such contractor shall be of proper workmanship and proper material and be reasonably fit for the purpose for which it is intended to be used."

The trial court further instructed the jury that if they found the materials used by Sampson and the workmanship of the laborers employed by it in the construction of the storage annex were not of the quality, type and kind that would provide a structure reasonably fit for its intended purpose and that would last and serve such purpose for a reasonable length of time, the jury should return a verdict for the plaintiff, but if they found the materials used and the workmanship of the laborers employed by Sampson were reasonably fit and suitable to provide a structure that would serve its intended purpose and last for a reasonable time, the jury should return a verdict for the defendant.

Thus, it will be seen that the trial court, in effect, held that there was included in the implied warranty of fitness and suitability a prospective warranty that the materials used and the workmanship of the laborers employed by Sampson would be reasonably fit and suitable to provide

a structure that would serve its intended purpose for a reasonable time.

At the trial, counsel for Sampson admitted there was an implied warranty of suitability and fitness in the construction contract, but asserted that it was breached, if at all, in June, 1959, when the annex was completed, and that the action was barred by limitation.

Sampson was served with process in Kansas, in accordance with the provisions of § 1, c. 32, Okl.Laws 1963, 12 O.S. Supp.1963, § 187. Such § 187, supra, which became effective September 13, 1963, in the form it was originally enacted, in parts here pertinent, read as follows:

"(a) Any person, firm, or corporation other than a foreign insurer licensed to do business in the State of Oklahoma who is a nonresident of this State [3] and who does any of the acts hereinafter enumerated, whether in person or through another, submits himself, and if an individual his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doings of any of said acts:

"(1) the transaction of any business within this State;

"(2) the commission of any act within this State;

"(3) the manufacture or distribution of a product which is sold in the regular course of business within this State and is used within this State;

"(4) contracting to insure any person, property, or risk located within this State at the time of contracting.

"(b) Service of process upon any person who is subject to the jurisdiction of the courts of this State, as provided in this section, may be made by personally serving the summons upon said person outside of this State with the same force and effect as though summons had been personally served

---

3. The clause "who is a nonresident of this State" was amended by § 1, c. 54, Okl. Laws 1965, effective March 29, 1965, to read "whether or not such party is a citizen or resident of this State." Such amendment has no pertinency in the instant case.

upon him within this State. Said summons shall be served and returned in the manner directed in 12 O.S.1961, § 175, and shall be verified in the manner directed in 12 O.S.1961, § 158. * * * "

Counsel for appellant contend that the statute may not be retrospectively applied and that the service in the instant action is therefore void.

From a judgment on a jury verdict in favor of the Elevator Company, Sampson has appealed.

I

*Was the Action Barred by Limitation?*

Sampson contends the action was barred by limitation, based on the premise that the implied warranty of fitness and suitability was breached, if at all, in June, 1959, when the elevator was completed.[4]

The contract was made and performed in Oklahoma and is governed by Oklahoma law. In the case of Hepp Brothers, Inc. v. Evans, Okl., 420 P.2d 477, the court, in the third syllabus, which in Oklahoma is the law of the case,[5] stated:

"If a warranty relates to a future event, before which the defect cannot be discovered with reasonable diligence, the warranty is prospective in character and the applicable period of limitations runs from the time of that event."

In that case, Hepp Brothers agreed to furnish and install a floor covering, consisting of vinyl tile squares, in the kitchen and den of a new house being built by Charles and Joyce Evans. The tile was installed in August and September, 1960. On August 29, 1963, the Evanses brought an action against Hepp Brothers for breach of a prospective implied warranty, alleging that in June, 1962, the tile squares began to come loose from the floor and continued so to do until all the squares had become loose.

The failure of the tile squares to adhere to the floor was due to defective adhesive used to cement or affix them to the floor. In that case, the trial court held that the Evanses could not have discovered the defectiveness in the adhesive used by the exercise of reasonable diligence until the tile began to come loose from the floor; that there was an implied warranty of fitness that the tile would adhere to the floor and last for a reasonable time; that a reasonable time had not elapsed when the tile came loose from the floor; that the cause of action did not accrue until the Evanses first learned of the defect in the adhesive used, when the tile began to come loose from the floor in June, 1962, and that the action was not barred by limitation.

On appeal, the Supreme Court of Oklahoma held there was an implied warranty of fitness in the contract to furnish and install the tile; that such warranty included a warranty that the tile squares would adhere to the floor and the tile would serve its intended purpose for a reasonable length of time; that the Evans's cause of action did not accrue until the fact that the adhesive used was defective first became known to them in June, 1962, and affirmed the judgment in their favor. The Supreme Court of Oklahoma, in the Hepp case, cited with approval as an analogous case, Aced v. Hobbs-Sesack Plumbing Co., 55 Cal.2d 573, 12 Cal.Rptr. 257, 263, 360 P.2d 897, 903, and quoted therefrom as follows:

"A warranty that the tubing was of the quality reasonably permitting its use in a radiant heating system would include a prospective warranty that the tubing would not, within a reasonable period of time, corrode and leak."

---

4. The limitation for bringing the instant action was three years after the cause of action accrued. 12 Okl.St.Ann. § 95. The instant action was commenced on January 19, 1965.

5. 12 Okl.St.Ann. § 977;
City of Altus v. Martin, Okl., 268 P.2d 228;
1942 Chevrolet Automobile Motor No. BA 193397 v. State, 192 Okl. 555, 136 P. 2d 395.

We set out the facts in the Aced case in subjoined note [6].

■■ We are of the opinion that the decisions of the Supreme Court of Oklahoma in the Hepp case and of the Supreme Court of California in the Aced case, which the Supreme Court of Oklahoma approved and followed, and the facts in the instant case, require us to hold that the construction contract here involved included an implied warranty of fitness and suitability, and that included in such warranty was a prospective warranty that the materials used by Sampson and the workmanship of the laborers employed by it in the construction of the storage annex would be of a type, quality and kind that would provide a structure which would be reasonably suited for its intended purpose and would last and serve that purpose for a reasonable time; that the cause of action did not accrue until the Elevator Company first learned of the defective concrete and defective anchoring of the reinforcing bars in June, 1964, when the collapse occurred; and that the action was not barred by limitation.

## II

### The Validity of the Service

In the case of Brown and Verity v. Haffa, Okl., (not officially reported) the cause of action accrued and the wrongful act upon which it was based was fully completed in "1956 or prior thereto"; the action was commenced on June 10, 1965; and the summons was thereafter served on the defendant in the State of Illinois, of which state he was an inhabitant, in accordance with the provisions of 12 O.S. § 187. In that case, Honorable Fred Daugherty, Judge of the Eastern, Northern and Western Districts of Oklahoma, held that § 187 could not be given retroactive effect, so as to authorize service of summons thereunder in cases where the cause of action sued on accrued prior to the effective date of such section.[7]

On the other hand, Honorable Luther Bohanon, Judge of the Eastern, Northern and Western Districts of Oklahoma, in the instant case, where the cause of action accrued, the action was commenced, and the summons was served on Sampson after the 13th day of September, 1963, the effective date of 12 O.S. § 187, as originally enacted in 1963, held the service made in accordance with § 187, supra, was valid, and gave the court jurisdiction over the person of Sampson.

Guerra De Chapa v. Allen, S.D.Texas, 119 F.Supp. 129 and Hasse v. American Photograph Corporation, 10 Cir., 299 F.2d 666, are cited and relied on by counsel for Sampson. However, in each of those cases, the service of summons was made in accordance with the statute of

6. Aced contracted to construct for the plaintiffs below a new home, with a radiant heating system installed in the concrete slab floor. Hobbs, as a subcontractor, agreed with Aced to furnish the necessary labor and materials for and to install the system. The installation of the system was completed in January, 1953. Numerous leaks developed in the tubing, and in 1955 the entire system had to be replaced. Aced conceded liability and judgment was entered against it. The appeal involved Hobbs's liability on a cross action brought against it by Aced.

The Supreme Court of California held the contract was not one of sale, but to furnish labor and materials and install the system in the home; that included in the implied warranty of fitness was an implied warranty that the heating system would be reasonably fit for its intended use, both as to workmanship and material, and would last a reasonable time; that such warranty related to a future event, before the occurrence of which the defect in the materials furnished could not have been discovered by the exercise of reasonable diligence; that the warranty was prospective in character and the statute of limitations began to run at the time such event occurred.

7. In his opinion, Judge Daugherty said: " * * * the motions of defendant to quash summons and to dismiss, which are now under consideration, are determinative on [of] whether or not 12 O.S.A. 187 may be applied to causes of action arising before the effective date of that addition to the State's nonresident service statutes."

the state in which the action was brought, providing for service of process on nonresident motorists and the cause of action accrued and the wrongful act upon which it was predicated was fully completed before the effective date of the statute.

The Oklahoma statute providing for service of summons on nonresident motorists, under which the summons was served in the Hasse case, is found in 47 Okl.St.Ann. §§ 391–400, inclusive, and the portions herein material read:

"§ 391. *Agreements implied from operation of motor vehicle on highways.*

"The use and operation of a motor vehicle in this State on the public highways thereof by a person who is a nonresident of the State shall be deemed:

"(a) an agreement by him that he shall be subject to the jurisdiction of the district courts of this State over all civil actions and proceedings against him for damages to person or property growing or arising out of such use or operation, and

"(b) an appointment by such nonresident of the Secretary of State of this State as his lawful attorney upon whom may be served all summons or original notices of suit pertaining to such actions and proceedings, and

"(c) an agreement by such nonresident that any summons or original notice of suit so served shall be of the same legal force and validity as if personally served on him in this State.

\* \* \* \* \* \*

"§ 394. *Service of summons or notice of suit*

"Plaintiff in any such action shall cause the original summons or notice of suit to be served as follows:

"(a) by serving a copy of said original summons or notice of suit on said Secretary of State or in lieu thereof by mailing with postage prepaid by certified mail with return receipt requested a copy of said original summons or

notice of suit to said Secretary of State, together with a fee of Two Dollars ($2.00) ; and

"(b) by mailing to the defendant and each of the defendants, if more than one, within fifteen (15) days after the filing of said summons or notice with the Secretary of State, by registered mail with return receipt requested, addressed to the defendant at his last known residence or place of abode, a notification of said filing with the Secretary of State. Laws 1941, p. 200, § 4; Laws 1957, p. 449, § 2; Laws 1961, p. 425, § 1."

In the case of Hayes Freight Lines v. Cheatham, Okl., 277 P.2d 664, 48 A.L. R.2d 1278, Hayes, a nonresident defendant, owned a semi-trailer. It turned the trailer over to Southwest Freight Lines under a "loan, interchange or interline agreement." Southwest operated the trailer for its own purposes in Oklahoma, by its own employee, who was killed in an accident in Oklahoma. The question was whether Hayes was a person engaged in the use and operation of a motor vehicle in Oklahoma, so as to be a person subject to substitute service under §§ 391 and 394, supra. In holding that it was not, because the trailer was not a motor vehicle and that the statute should be strictly construed, the court in its opinion said:

"The nonresident motorist statute of Oklahoma, 47 O.S.1951 § 391 et seq. *imposing a contractual obligation on nonresident motorists who use the highways of this State for the operation of their motor vehicles* is in derogation of the common law and affects substantial rights so that the statute cannot be extended by implication but must be strictly construed. \* \* \*" (Emphasis supplied.)

In Clendening v. Fitterer, Okl., 261 P.2d 896, the defendant was a resident of Oklahoma at the time the cause of action accrued and the wrongful act on which it was based occurred. He thereafter became a nonresident of Oklahoma and service of process was made on him as

provided in § 394, supra. The court held that a resident motorist does not, by operating his motor vehicle on the highways of the state, impliedly appoint the Secretary of State as his agent upon whom service of process may be made under § 394, supra.

We are of the opinion, however, that the instant case is distinguishable from the cases adverted to above, for reasons we shall now undertake to state. While the acts of Sampson in using faulty materials in the construction of the grain storage annex occurred in 1959, they were continuing wrongs, and their effect continued and they were not fully completed until they caused the collapse of the grain storage annex and rendered the remainder thereof unusable on June 19, 1964; and while the prospective warranty, included in the implied warranty of fitness and suitability, that the materials used and the workmanship employed in the construction of the grain storage annex would be such that it would be reasonably suited for its intended purpose and would last and serve that purpose for a reasonable length of time, was given when the construction contract was entered into, such prospective warranty was a continuing one, and the breach thereof by Sampson did not occur until a portion of the grain storage elevator collapsed and the remainder thereof became unusable on June 19, 1964, and the cause of action sued on did not accrue until that date.

■ Since the wrongful acts of Sampson in using defective materials in the construction of the elevator were continuing wrongs that were not fully consummated until June 19, 1964, and the prospective warranty was a continuing one and the breach thereof did not occur and the cause of action did not accrue until that date, the holding that the service in the instant case was valid would be a prospective, rather than a retroactive application of § 187, supra. Accordingly, we hold the service of summons was valid.

Affirmed.